645 So.2d 631 (1994)
Stacy BUFFINET
v.
PLAQUEMINES PARISH COMMISSION COUNCIL, et al.
No. 93-CA-0840.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 1994.
Rehearings Denied December 13, 1994.
*633 H. Edward Sherman, Travis J. Causey, Jr., New Orleans, for plaintiff/appellant.
Brian J. Waid, Bubrig, Waid & Conner, Buras, for defendants/appellants, Tom Popich, Popich Bros., et al.
George Pivach, II, Mark A. Pivach, Gregory W. Minton, Pivach, Cossich & Pivach, Belle Chasse, for defendant/appellant, Plaquemines Parish Government.
Jeffrey Raines, Sacks & Eason, New Orleans, for defendant-appellee, Institute of London Underwriters.
J. Clayton Davie, Jr., McAlpine, Peuler, Cozard & Davie, New Orleans, for defendant-appellee, Ocean Marine Indemnity Co.
Before CIACCIO, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
This appeal arises out of an action for personal injuries filed by plaintiff Stacey Buffinet for injuries allegedly sustained in a fall on a dock in Plaquemines Parish. Plaintiff filed suit against the Plaquemines Parish Commission Council (the "Parish"), Tom Popich individually, Offshore Shipyard, Inc. ("Offshore Shipyard"), Local Tugs, Inc. ("Local Tugs"), Diamond Barges, Inc. ("Diamond Barges"), Popich Brothers Water Transport, Inc., Venice Jo-Boats, Inc., Service Tug and Crewboats, Inc., Popich Brothers Superior Oyster Company, Inc., Oyster Lands Leasing, Inc., Popich Lands, Inc., and Popich Enterprises, Inc., all entities owned by Tom Popich and his brother Joe, and two insurers allegedly providing coverage for one or more of the Popich entities. Following a bifurcated trial the court and jury reached inconsistent factual findings with respect to the Parish and the non-governmental defendants.[1] *634 Plaintiff and all defendants raise a number of issues on appeal.
The accident occurred on the evening of December 6, 1986, at approximately 8:00 p.m. Plaintiff accompanied her husband, Gavin Buffinet, to the "Venice Work Vessel" dock (the "Dock") located in Plaquemines Parish on the Jump Basin Canal, also known as the Venice Navigation Canal and Basin, so that he could drop off a radio pager at a tug moored at the Dock. Gavin was employed by Local Tugs. The Dock itself runs parallel to the shore. Three walkways lead from the shore to the Dock. The Dock is lower than the particular walkway which plaintiff and her husband were using to get to the Dock. Gavin Buffinet testified that the board in question was two inches thick by twelve inches wide, a 2" x 12" piece of lumber. It was the last board on the walkway adjoining the Dock. Photographs taken by him the day after the accident showed that it rested on one piling and two cross beams. According to Gavin Buffinet, who was walking in front of plaintiff, after he stepped from the walkway onto the dock he heard plaintiff "holler." Plaintiff told him that the board had "come up," causing her to fall. He said after the fall plaintiff was "just about hysterical" and was holding her knee. He and another person carried plaintiff to the car and he took her to the emergency room at Plaquemines Parish General Hospital where she was treated. Plaintiff's testimony tracked that of her husband. She stated that when she stepped on the board "it flipped me up." She said it twisted her ankle and caused her to fall and hit her knee on the dock. She felt "excruciating pain."
The Dock was built by Venice Work Vessel, Inc. ("VWV, Inc."), an entity formed in 1964 as an outgrowth of a joint effort by the oil and gas industry, local work boat owners and Plaquemines Parish government to promote the local work boat business. VWV, Inc. constructed the Dock on land to which the Parish had been given a "PERPETUAL RIGHT-OF-WAY AND EASEMENT" by the Louisiana Fruit Company in 1946. VWV, Inc. also operated a dispatch service for local work boats. Tom Popich was a founding incorporator of VWV, Inc. VWV, Inc. gradually ceased to do business after Hurricane Camille in 1969 and at the time of plaintiff's accident was apparently no longer in existence. The Dock continued to be used by work boats owned by Local Tugs, as well as other work boats owned by persons and/or entities other than the Popichs. Another Popich company, Diamond Barges, kept a water barge moored at the Dock from which work boats could load fresh water. Persons employed by Local Tugs and another Popich company, Offshore Shipyard, would nail down boards on the Dock that they noticed had become loose.
Plaintiff claimed that the Popich companies had assumed the custody and care, or "garde," of the Dock and were negligent or strictly liable to plaintiff together with the Parish. Plaintiff also claimed that vessels owned by Popich companies struck the Dock rendering it unreasonably dangerous. Following the close of plaintiff's case-in-chief, the trial court granted directed verdicts in favor of Popich Brothers Water Transport, Inc., Venice Jo-Boats, Inc., Service Tugs and Crew Boats, Inc., Popich Superior Oyster Company and Oyster Lands Leasing, Inc. with respect to any premises liability, and granted directed verdicts in favor of Popich Brothers Water Transport, Inc, Local Tugs, Inc. Diamond Barges, Inc., Service Tugs and Crew Boats, Inc., and Venice Jo-Boats, Inc., dismissing with prejudice all claims of plaintiff with respect to vessel negligence and/or striking.
At the close of trial the jury found no negligence or strict liability on the part of the Parish, and no duty to maintain or negligence in maintaining on the part of Tom Popich, Offshore Shipyard, Diamond Barges or Local Tugsno liability as to any of these remaining defendants. The trial court found that the Parish was negligent, assessing the Parish's percentage of fault at 33 1/3% to the Parish, that Tom Popich, Offshore Shipyard, Diamond Barges or Local Tugs were negligent, assessing 33 1/3% fault divided among those companies, and that plaintiff herself was comparatively negligent, assessing 33 1/3% fault to her. Damages were assessed by the trial court at a total of $113,695.39.
*635 The factual findings of the jury and the trial court were inconsistent. The jury found no fault on the part of any of the defendants while the trial court found fault on the part of the Parish and four private defendants. The jury did not consider the comparative fault of plaintiff but the trial court found her at fault. There was no inconsistency in this respect. In addition, the jury did not assess damages while the trial court did. There was no inconsistency in this respect. The Louisiana Supreme Court has held that on review of a bifurcated trial an appellate court must "resolve the differences in the factual findings between the jury and the judge ... and to render a single opinion based on the record." Thornton v. Moran, 343 So.2d 1065 (La.1977). Accordingly, this court held in Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4th Cir.1978), writ denied, 365 So.2d 242 (La.1978) that:
On appeal neither trier of fact is entitled to have greater weight accorded to its factual findings. Therefore, it is necessary for the appellate court to make its own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent. (Footnotes omitted).
Accord McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4th Cir.1992), writ denied, 595 So.2d 655 (La.1992); Geraci v. Louisiana DOTD, 589 So.2d 1215 (La.App. 4th Cir.1991); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.1983), writ not considered, 437 So.2d 1135 (La. 1983).[2]
Accordingly, we will examine the record de novo as to the issue of liability as to the issues that have been appealed. Plaintiff has not appealed the trial court's directing of verdicts in favor of some defendants, including all of those related to vessel striking/negligence. In addition, while Offshore Shipyard was not included in the directed verdict with respect to vessel striking and/or negligence, the record does not establish that Offshore Shipyard owned any vessels which may have struck the Dock or that any vessels in its control struck the Dock. Therefore, we will not review or consider any issues relating to claims of vessel striking/negligence on the part of any defendants. Further, we will not review any claims of liability for the condition of the Dock insofar as the liability of Popich Brothers Water Transport, Inc., Venice Jo-Boats, Inc., Service Tugs and Crew Boats, Inc., Popich Superior Oyster Company and Oyster Lands Leasing, Inc. The trial court did not address the liability of two Popich entities: Popich Lands, Inc. and Popich Enterprises, Inc. There is no evidence in the record to support any claim against Popich Lands, Inc. or Popich Enterprises, Inc. relating to the Dock. Therefore, we will examine the record as it pertains to the liability of defendants Plaquemines Parish, Tom Popich, individually, and the three Popich companies Local Tugs, Offshore Shipyard and Diamond Barges.
There are two theories of liability available to a plaintiff who claims she was injured as a result of the condition of a thing: negligence, under La.C.C. arts. 2315 and 2316, and strict liability, under La.C.C. art. 2317. Under both theories of liability a plaintiff must prove that the condition of the thing presented an unreasonable risk of harm, or was defective, and that this condition of the thing was a cause-in-fact of her injuries. Jolly v. Otis Elevator Co., 620 So.2d 497 (La.App. 4th Cir.1993). Also, under both theories of recovery a plaintiff is required to prove that the thing in question was owned by the defendant and/or that it was in his custody or care and, thus, that the defendant owed the plaintiff or all persons in the general class to which she belongs (i.e., persons who may use or encounter the thing) a duty to keep the thing in a condition such that it will not present an unreasonable risk of harm. In a negligence action the plaintiff must further prove that defendant had actual or constructive knowledge of the risk of harm *636 presented by the condition of the thing and failed to take steps to remedy the condition or to warn persons of its existence. In a strict liability action a plaintiff is relieved of the burden of proving that the defendant knew of the existence of the condition. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); Jolly v. Otis Elevator Co., supra. However, when the alleged owner or custodian of the thing is a public entity, to establish strict liability a plaintiff must still prove actual or constructive notice. La.R.S. 9:2800(B).

EXISTENCE OF A DEFECT
Plaintiff claims she fell when she stepped on a board and it flipped up causing her to fall. The alleged board was the last board of the walkway, adjoining the dock itself. There is no question but that the dock itself was approximately six inches lower than the walkway. An expert in the field of marine surveying, Sheldon Held, who was hired to inspect the dock after the accident by counsel for one of the defendants, testified that this six inch difference was due to subsistence. He also noticed three loose boards when he inspected the Dock. Gavin Buffinet testified that he had walked across the board in question probably "thousands" of times with no problems. He estimated that during the thirty days prior to the accident he had walked across the board sixty or seventy times and admitted that it had not shaken when he walked on it. He said he had walked across the board earlier the same day and it had not come up. He also stated that seconds before he heard plaintiff scream he stepped on the same board and it had not come up. However, the day after the accident Gavin Buffinet inspected the board and said it came up when he pulled on it. Photographs taken by him that next day showed the loose board. Billy Wayne Johnson, a former Local Tugs employee, testified by deposition that everyone knew the board was loose. One of the owners of the Popich businesses, Tom Popich, as well as several employees of the companies, testified that Popich employees had nailed down and/or replaced loose boards on the Dock.
A loose board presented the risk that someone might step on it, upset it and fall or trip. In addition, the six inch drop from that particular board to the dock itself increased the risk of harm. We find that the condition of the Dock presented an unreasonable risk of harm. Plaintiff was the wife of a Local Tugs employee who went to the Dock with her husband so he could drop off a radio beeper used in connection with his employment. Thus, the risk of harm presented by the condition of the Dock encompassed plaintiff.[3]

CAUSATION
Plaintiff testified that the board flipped up on her and she fell and injured her right knee. Her husband heard her yell and turned to see her laying on the Dock. Billy Wayne Johnson testified that he observed plaintiff fall as he sat in his perch in the wheelhouse of the Local Tugs vessel the Grey Eagle. Leon A. Bourgeois testified that he was on the Grey Eagle at the time plaintiff fell but did not actually see her fall. Dr. David Beary was a physician who examined plaintiff in the emergency room of Plaquemines Parish General Hospital on the night of the accident, December 6, 1986. His exam revealed medial instability in the right knee and pain on full flexion of the knee with a positive anterior draw sign test. He did the anterior draw sign test to check for injury to the anterior cruciate ligament. He said a positive test indicates that he found more movement than there should have been. He immobilized the knee and referred her to an orthopedist because he believed that she had sustained a serious injury to her right knee. This, although his diagnosis, as reflected on the hospital record, was "right knee strain." Dr. Beary testified that with reasonable medical certainty he believed that it was more likely than not that the injury occurred that night. Dr. Beary's examination showed no evidence of pre-existing problems affecting her right knee, although plaintiff *637 mentioned the 1978 surgery involving ligaments and cartilage in her right knee.
Dr. Stuart Philips, an orthopedist, first examined plaintiff on January 16, 1987, approximately six weeks after her accident. The history she gave was the trip and fall on the Dock. An examination indicated that plaintiff was experiencing pain in her right knee. There was some atrophy in her right quadricep muscle which Dr. Philips stated could have developed since December 6, 1986. She walked with a limp, guarding her right knee. Her right kneecap or patella was hypermobile meaning that it moved more than normal. An x-ray of the knees indicated that the right kneecap was higher than the left one. This indicated injured ligaments. Dr. Philips prescribed medication for pain and put the right leg in a splint. He saw plaintiff five more times, the last time being May 1, 1987. During those exams he observed a condition known as reflex sympathetic dystrophy, an uncommon condition involving an irritation of the nerves causing sweating, coldness and pain. He said this condition was consistent with her history and could have been caused by a blow to the front of the knee, a blow to a superficial nerve. His diagnosis was internal derangement of the knee but Dr. Philips admitted that he did not know exactly what plaintiff was suffering from. Dr. Philips felt that he was treating an injury to the ligaments around the right knee, a patella femoral ligament injury. However, because plaintiff was in so much pain Dr. Philips was unable to perform several tests which may have helped him make a more accurate diagnosis. In his report Dr. Philips stated that it appeared the ligaments were intact and unstretched. He said if there was a torn anterior cruciate ligament he would expect to find stretching of the ligaments. None of his notes reflected that he suspected anterior cruciate tear. He did not exclude a possible anterior cruciate ligament damage. He said he guess[ed] that one could damage their anterior cruciate ligament if they twisted it.
Dr. Charles Anastasio, an orthopedic surgeon, testified that he first examined plaintiff on March 28, 1988. She gave a history of an accident in December 1986 and prior surgery on her right knee in 1978 for ligament and cartilage damage. Dr. Anastasio's diagnosis was symptomatic chondromalacia of the right patella joint, a low-grade arthritic condition or degenerative condition of the articular cartilage on the underside of the kneecap. Dr. Anastasio next saw plaintiff on April 11, 1988 when she still complained of pain around her kneecap. Conservative treatment had been ineffective and on April 13 arthroscopic surgery was performed to shave and smooth the underside of the patella. During that surgery Dr. Anastasio examined the anterior cruciate ligament and found it to be intact and undamaged. He stated that the use of the shaving instruments in the arthroscopic surgery would not have damaged the anterior cruciate ligament. He said that a fall or blow to plaintiff's knee could have aggravated a pre-existing condition and caused the chondromalacia to become symptomatic. He said everyone has chondromalacia to some extent and was unable to say the degree of her chondromalacia was a degenerative condition or was caused by trauma to the knee. Addressing plaintiff's 1978 surgery on her right knee, Dr. Anastasio stated that knee operations could cause the development or exacerbation of existing chondromalacia. He believed plaintiff was honest and not exaggerating her complaints. He agreed that if her knee was asymptomatic prior to the December 6, 1986 accident it played a role in "causing, aggravating, exacerbating, or precipitating the chondromalacia."
Dr. Hiromu Shoji, another orthopedist, testified that he first examined plaintiff on June 7, 1988. She gave a history of the December 1986 accident and complained of pain in her right knee and locking up and giving way of the knee. Hospital records show that on October 31, 1987 plaintiff was treated in the emergency room of Plaquemines Parish General Hospital after she fell when her right knee "gave out on her." This was subsequent to her last visit with Dr. Anastasio. During his examination Dr. Shoji performed the "Lachman" test, one of the tests that Dr. Philips could not perform due to the level of pain plaintiff was then experiencing. The Lachman test was positive for anterior cruciate ligament insufficiency. That was associated with degenerative joint *638 disease and a degenerative tear of the meniscus. Dr. Shoji next saw plaintiff on January 1, 1989 when he found no significant changes although there was a better range of movement in her knee. The next time he saw plaintiff was on June 9, 1989 with the same symptoms. On the next examination, September 29, 1989, he observed no significant changes. Plaintiff still complained of pain in her right knee with it giving way and locking up. It was Dr. Shoji's opinion that reconstructive surgery was warranted. On November 6, 1989 plaintiff had arthroscopic surgery during which Dr. Shoji removed a torn anterior cruciate ligament. A patellar tendon was removed with some attached bone material and this was attached with screws to the tibia and femur to substitute for the anterior cruciate ligament.
Dr. Shoji was aware that Dr. Philips reported nothing about finding an anterior cruciate ligament injury. He was also aware that Dr. Anastasio specifically reported that the anterior cruciate ligament was intact and undamaged when he performed arthroscopic surgery in April 1988. He said the surgery performed by Dr. Anastasio would not have caused the positive result on the Lachman and drawer sign test, i.e. that the anterior cruciate ligament problems could not be the result of that surgery by Dr. Anastasio.
Dr. Philips, Dr. Anastasio and Dr. Shoji all testified that plaintiff did not inform them of any injury to her knee in 1984. Medical records show that on July 18, 1984 plaintiff was treated in the emergency room of Plaquemines Parish General Hospital. The nursing notes reflect that plaintiff slipped on a wet porch. She reported pain in her back and her right knee. The medical records indicate an x-ray was taken of her right knee at that time. There was no swelling in the right knee and the diagnosis was multiple soft tissue injuries. Plaintiff denied injuring her knee in 1984. In any case, plaintiff stated that her knee did not bother her from the 1984 incident to the day of the December 6, 1986 accident. She also testified that her knee had healed from the 1978 surgery for an injury resulting from a fall in a skating rink.
Plaintiff also failed to inform Dr. Philips, Dr. Anastasio or Dr. Shoji that she had twisted her knee at least a couple of times after the December 1986 accident while wrestling with her husband Gavin. She claimed that she did not injure it by twisting it. She said: "Twisting it was not an injury, it just made it hurt, just like other things I do make it hurt." Leon Bourgeois testified that in 1984 or 1985 he heard plaintiff complain that her leg was sore. He saw her limping once or twice before the December 6, 1986 accident. But, he said prior to the 1986 accident you could not notice anything wrong with her leg. After that accident, he said, you could tell something was wrong with the leg. He said she continually complained about her right leg. Plaintiff admitted that in 1989 she pled guilty to a felony, possession of a controlled dangerous substance.
Plaintiff had been working at a care facility as a Community Living Specialist at the time of the accident. She began that job in October 1986 and was terminated on December 14, 1986. She had walked off that job on December 1, 1986 because, she said, she had a disagreement with a supervisor concerning her job duties. A physical examination done in late September 1986 in connection with that employment indicated that her extremities were all within normal limits.
In a tort action a plaintiff must prove all of the elements of her claim, including injury and causation, by a preponderance of the evidence. Anglin v. White, 572 So.2d 779 (La.App. 4th Cir.1990). Mere possibilities are insufficient to support a judgment. Id. at 781. The evidence establishes by a preponderance that plaintiff suffered a fall on the Dock on December 6, 1986. Based on the testimony of plaintiff herself, her husband, and Billy Wayne Johnson as to plaintiff being in pain after the fall, and the testimony of Dr. Beary who treated her immediately after the fall, as well as the testimony of Dr. Charles Philips who began treating her some six weeks after the fall, we find that she sustained a knee injury in the fall. A finding that the anterior cruciate ligament injury was caused by that fall would require that this court find that Dr. Charles Anastasio *639 incorrectly observed that ligament to be intact and undamaged when he performed arthroscopic surgery in April 1988. However, the initial treating physician, Dr. Beary, found a positive draw sign test which the testimony of the other medical experts established is indicative of a problem with the anterior cruciate ligament. In addition, Dr. Philips, who was unable to perform the anterior draw sign test, thought that plaintiff sustained some internal derangement of the kneewhat he believed was a patellar ligament injury. Dr. Shoji definitely found a torn anterior cruciate ligament, i.e., internal derangement. Therefore, we believe the evidence preponderates in favor of a finding that this condition was caused by the fall. We also believe the evidence preponderates in favor of a finding that preexisting chondromalacia was aggravated by the fall.
In conclusion, we find that plaintiff, whose knee had been in relatively good shape immediately preceding this accident, fell on the Dock on the evening of December 6, 1986 as a result of an unreasonably dangerous condition or defect presented by the Dock. That fall resulted in plaintiff sustaining an anterior cruciate ligament injury necessitating the replacement of that ligament in 1989, and also resulted in aggravating a preexisting condition of chondromalacia necessitating arthroscopic surgery in April 1988. We reach this determination fully considering all of the evidence, whether proffered or accepted into evidence, reflecting on plaintiff's character and credibility.

LIABILITY OF PLAQUEMINES PARISH
A threshold issue in the instant case is whether the Parish owned the Dock and/or had the custody of the Dock. The term "custody" has its origin in the French term "garde." Garde is the obligation imposed by law on the proprietor of a thing or on the one who avails himself of it to prevent the thing from causing damages to another. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). The things in one's custody and care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992); Loescher v. Parr, 324 So.2d 441, fn. 7 (La. 1975). Although ownership may indeed evidence garde, this guardianship may also rest with one who is not the owner. Socorro v. Orleans Levee Board, 579 So.2d 931 (La. 1991); Loescher v. Parr, supra, (guardianship may belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others).
In 1946 the Parish was given a perpetual right-of-way and easement on property "embracing" the Jump Basin Canal by the Louisiana Fruit Company which owned the land. There was some question raised during the testimony of Luke Petrovich, a Parish official, as to the ownership of the strip of land forming the shore adjacent to the Dock. However, the copy of a plat attached to and forming a part of the instrument giving the right-of-way and easement to the Parish indicates that Louisiana Fruit Company owned all land "embracing" the Jump Basin Canal, including the strip of land adjacent to the Dock.
As previously discussed, the Parish was instrumental in forming VWV, Inc. in 1964. However, there is no indication that the Parish was a stockholder in that company. VWV, Inc. constructed the Dock. It adjoined and was connected by walkways to the shore of the Jump Basin Canal. The walkways provided access to the Dock from the shore. There was no evidence introduced at trial to show that any Parish employee ever made any repairs to the Dock. Nor was any evidence introduced indicating that the Parish ever treated the Dock as its own.
Austin Barrios was employed by the Plaquemines Port Harbor Terminal in 1986 at the time of plaintiff's accident. Barrios was an inspector who inspected docking facilities in the Parish to log in vessels using the Parish waters so that the Parish could collect tariffs from the vessels. Barrios said the Dock was designated as the "Popich Dock" on Parish marine inspection records. However, Barrios stated that he did not know who owned or controlled the Dock. He said he usually checked each dock in his area at least once a day. While his duties consisted of logging in vessels, not inspections of dock *640 structures, Barrios said he had been on the Dockapproximately ten times during 1986and had never noticed any loose or rotten boards. He also stated that he had never had any trouble walking on the Dock.
Howard Wilcox, the insurance manager for the Parish since 1987 and Parish purchasing agent from 1961-1976, testified that the Parish did not purchase insurance coverage for the Dock. He knew of no records indicating that the Parish had ever made repairs to the Dock. As purchasing agent for the Parish he would have purchased the materials used to make any such repairs. Tommy Hufft testified that a water meter at the Dock was in the name of Service Tugs and Crew Boats, Inc. at least as far back as November 1980. As far as Hufft knew, that was the only water service at the Dock.
Luke Petrovich was the Commissioner of Law and Natural Resources for the Parish in 1986. Petrovich had been an incorporator of VWV, Inc. in 1964. He said the Parish was "never really involved in the [D]ock." Petrovich testified that there had been an understanding from the early 1960's that Popich entities became the beneficiaries and "exclusive owners and operators of" the Dock. While other vessels used the Dock, Petrovich said they would use it through Popich. Petrovich never entered into any type of agreement with Tom Popich regarding the use of the Dock on behalf of the Parish. However, he did have discussions with other persons regarding the exclusive use of all or a part of the Dock by the Popichs. He also testified that he discussed with Tom Popich and the owners of Allied and American tug boat companies, particularly the Citanovich or Sercovich brothers, to try and work out some arrangements regarding the use of the Dock. He told the other parties that they should try and work with Popich because of Popich's long use of the Dock. Petrovich stated that the area of the Dock where the accident occurred was under the control of Popich and that they were responsible for maintaining the structure.
Introduced into evidence was a copy of a Parish resolution granting a permit to Tom and Joe Popich for the exclusive use of nine waterfront lots across the Jump Basin Canal from the Dock. The Popich business Offshore Shipyard is located on the lots. The Popichs paid the Parish $6,000 per year for the use of these lots. Also introduced into the record were several copies of Plaquemines Parish permit agreements granting permits to other persons for the use of waterfront property on the Jump Basin Canal near the Dock. These permit agreements provided for the payment of annual fees to the Parish by the grantees.
Tom Popich testified that the Dock was not his dock and had never been his dock. He denied any agreement or understanding between himself or his companies and the Parish regarding their exclusive use of the Dock. Popich said the Parish owns the Dock. He stated that the Parish paid to have the Dock constructed because VWV, Inc. had no funds to do so. He said the only Popich vessels that used the Dock were those belonging to Local Tugs. Local Tugs owned tugs designated "Eagle," such as the War Eagle and the Grey Eagle, as well as the Charles Alan and Iron Horse tug boats and a barge, the LT 579. Popich testified that other vessels used the Dock besides his.
Earnest A. Bourgeois, Sr. was the Harbor Master of the Buras Boat Harbor, located in Plaquemines Parish approximately two-and-one-half miles from the Jump Basin Canal and the Dock. Bourgeois had six or seven men working for him helping maintain the Buras Boat Harbor dock and surrounding area. He said he used to pass by the Dock at the Jump Basin Canal on his way to the Buras Boat Harbor every day. He never observed any Parish personnel working on the Dock. He said he had no idea whether the Parish owned the dock. He said as Harbor Master of the Buras Boat Harbor he had nothing to do with the Dock.
Michael E. Kirby, a former president and council member of the Plaquemines Parish Commission, testified that while he was president from 1982-1983 he received no requests for repair of the Dock from any persons, including Parish employees. He said he had no idea whether the Parish owned the Dock and never thought the Dock belonged to the Parish.
*641 The Parish had a perpetual right-of-way and servitude on the narrow strip of land on the Jump Basin Canal where the Dock was constructed and there is no evidence that the Parish ever alienated this property. The Parish benefitted from the Dock insofar as it facilitated the use of local work boats in the Parish and insofar as the Parish collected tariffs from vessels docked there. These benefits, however, would accrue to the Parish regardless of whether the Dock was owned by the Parish or owned by another party. Besides the testimony of Tom Popich, there is no evidence that the Parish constructed the Dock. There is no evidence that the Parish performed any type of upkeep on the Dock or expended any funds to maintain the Dock since it was constructed in 1964. On the other hand, the Parish did perform routine and continual maintenance at a dock located at the Buras Boat Harbor only two-and-a-half miles away. This indicates that the Parish did not believe that it was responsible for the Dock in question.
The preponderance of the evidence establishes that the Parish did not have the garde of the Dock for purposes of finding it strictly liable under La.C.C. art. 2317. Further, there is nothing to establish any other duty on the part of the Parish to keep the Dock free of dangerous conditions.
Moreover, the Parish cannot be held liable under La.C.C. art. 2315 or C.C. art. 2317 unless it can be shown that it had actual or constructive notice of the allegedly dangerous condition of the Dock. Kent v. Gulf States Utilities Co., supra; Jolly v. Otis Elevator Co., supra; La.R.S. 9:2800(B). There is no evidence establishing that the Parish had actual notice. Nor is there any substantial evidence that the Parish had constructive notice of any dangerous condition of the Dock. Constructive notice on the part of a public entity may be found where the dangerous condition existed for such a period of time that the entity should have discovered it. La.R.S. 9:2800(C); LeBlanc v. City of New Orleans, 573 So.2d 1274, 1276 (La.App. 4th Cir.1991), writ denied, 575 So.2d 826 (La.1991). According to the testimony of both plaintiff and Gavin Buffinet the board was not noticeably loose. According to Gavin Buffinet, the dock itself had been "slanting down" for several months before the accident.
The deposition of Billy Wayne Johnson, a former employee of Local Tugs, was read to the jury. Johnson stated that he had walked across the board many times and that it had "teeter-tottered" on him before. He said he knew that particular board was loose and stated that anyone who worked on the boats "knew how bad the boards were." Sheldon Held, an expert in marine surveying hired by defense counsel, testified that the dock was about six inches lower than the walkway in question, due he said, to subsistence, indicating a gradual process. He also noticed three loose boards when he inspected the Dock. Austin Barrios, a Parish employee, testified that he had been on the Dock in 1986 and not noticed any problems. There was some vague evidence from plaintiff regarding an occasion when she allegedly observed the water barge, being pushed by a Local Tug work boat, strike the Dock. She claims that caused the dock itself to be lower than the walkway at the point where she tripped. This contradicted the testimony of Sheldon Held, the marine surveyor.
The evidence shows there were loose boards on the Dock and that the dock itself was some six inches lower than the walkway and may have been that way for several months prior to the accident. The board in question may have been noticeably loose prior to the accident, but there is no evidence how long it had been that way. The evidence as a whole does not furnish a sufficient basis to find that defect(s) existed for such a period of time that the Parish would have noticed them. Therefore, the Parish could not be charged with constructive notice.
Thus, even if we had found that the Parish owned the Dock or had garde of it, or otherwise had a duty to maintain it, plaintiff failed to establish that the Parish had actual or constructive notice of the defects. Therefore, plaintiff would have failed to meet her burden of proving either negligence or strict liability on the part of the Parish.
For the foregoing reasons we find no liability on the part of the Parish.

*642 LIABILITY OF THE POPICH GROUP

As with the Parish, the threshold issue as to the liability of Tom Popich and/or his companies, Local Tugs, Offshore Shipyard, and Diamond Barges are liable is whether either or all of them had the garde of the Dock. Plaintiff's husband Gavin Buffinet testified that he had seen Popich company employees repair the Dock before the accident but not the portion of the Dock where the accident occurred. He personally had nailed down loose boards while employed by Local Tugs. He said Popich vessels used to moor at the Dock from the middle of the Dock to the end of the Dock, encompassing the area where plaintiff fell. However, he also stated that vessels belonging to other persons or companies used the rest of the Dock. Those regularly docking at the Dock were Popich vessels and vessels belonging to two other companies. When he worked as a dispatcher for Offshore Shipyard he said he dispatched some of these other vessels but that he never directed the other vessels where to moor at the Dock.
The marine inspection logs kept by Parish employee Austin Barrios show that one or more Local Tugs vessels was always docked at the Dock. Usually, approximately one-half of the vessels at the Dock were owned by Local Tugs. However, sometimes that was not the case. On December 11, 1986 the log shows only four Local Tug vessels out of ten at the Dock. The day before, December 10, 1986, only three of the seven vessels at the Dock were Local Tug vessels. December 8, 1986, five of eleven vessels were Local Tugs. On more than one occasion there were eight Local Tugs vessels at the Dock at one time. Even though non-Popich vessels used the Dock, the only evidence introduced at trial concerning any repairs done by a non-Popich company was the testimony of Leon Bourgeois that he had seen other companies doing repairs to the Dock.
Tom Popich testified that he never entered into any type of agreement with the Parish whereby he obtained the exclusive use of the Dock. He said the only Popich company vessels that docked at the Dock were owned by Local Tugs. He said other vessels, non Popich vessels, also use the Dock. However, he admitted that "[i]f boards are loose or something happened to the [D]ock" he would send Offshore Shipyard employees "over with the materials and get men off the tugs to fix the board, reinforce it, whatever it takes." He said he did so to keep people, either his employees or "someone else" from getting hurt. He said employees of Offshore Shipyard and Local Tugs would do the repairs. The only time he knew that a board was loose was if a tug boat captain or crewman told him. He also stated that VWV, Inc. probably nailed down some boards after Hurricane Betsy in 1965 and Hurricane Camille in 1969. Tom Popich mentioned nothing about repairs being done by employees of any other companies whose vessels used the Dock.
Tom Popich stated that in 1972 a bill for the water service to the Dock started coming to Service Tugs & Crew Boats, Inc. Tommy Hufft, a supervisor for the Plaquemines Water Works, testified that the water meter at the Dock provided service to Service Tugs & Crew Boats. Hufft testified that the Parish only ran the water to the meter. Any water line off of the meter would have been constructed by someone other than the Parish. There is no evidence as to who built the water line out to the dock. Tom Popich stated that water from this water service is loaded on water barges owned by Diamond Barges which barges are transported by Local Tugs work boats. Popich said a Diamond Barge water barge was docked on and off at the Dock to pick up water during 1986.
Larry R. Landry worked for Offshore Shipyards from 1980 to August 1987 and said the only Popich vessels using the Dock belonged to Local Tugs. He said other vessels used the Dock including work boats from another company and fishing boats. In 1987 he said he was working for both Offshore Shipyard and Diamond Barges and performed repairs to the Dock, putting in additional pilings. This was approximately five or six months after plaintiff's accident. When they performed the repairs they used a crane to lift a portion of the Dock to re-bolt timbers.
Ronald Coates worked for Local Tugs and testified that although some people call the *643 Dock the "Popich dock," anyone can tie up there and Popich employees cannot tell them to leave. Coates testified that he replaced the board in question after plaintiff's accident. Billy Wayne Johnson, in the wheelhouse of the Grey Eagle tug boat at the time of plaintiff's accident, saw plaintiff fall. Johnson knew the board in question was loose. He said it was not nailed down. He also stated there were other loose boards. He admitted to being a friend of both plaintiff and her husband. He also stated that neither Local Tugs nor Diamond Barges owned the Dock and said that tug boats belonging to other companies, as well as fishing boats, use the Dock. Johnson testified that Offshore Shipyard repaired Local Tugs vessels while they were moored at the Dock and kept Local Tugs vessels at the Dock while waiting to be repaired.
Local Tugs was the primary beneficiary of the Dock. Its vessels, as many as eight at a time, docked there everyday, regularly occupying almost one-half of the available space. Local Tugs vessels were also kept at the Dock while waiting to be repaired by Offshore Shipyard, which performed some of those vessel repairs at the Dock. Diamond Barges, a Popich company, regularly kept a water barge at the Dock and obtained its water from the water line there. That water was provided through a Parish meter in the name of another Popich company, Service Tugs and Crew Boats.[4] Although Tom Popich testified that VWV, Inc. nailed down boards on the Dock in 1965 and 1969, and Leon Bourgeois testified that he had seen employees of one other company nailing down boards, no other witnesses testified as to anyone other than Popich companies doing any type of repairs. A number of witnesses, including Tom Popich himself, testified that employees of Local Tugs and Offshore Shipyard performed repairs and Offshore Shipyard provided materials. The evidence establishes that these two companies regularly performed routine maintenance of the Dock. There is no evidence that any employee of Diamond Barges performed repairs at the Dock prior to plaintiff's accident. Diamond Barges cannot be held to have had the garde of the Dock prior to the accident.[5] There is no record or evidence that anyone, including a Popich employee, ever requested that the Parish repair the Dock. The only connection the Parish had to the Dock was that it was built on Parish land. The Parish had nothing to do with the day-to-day use, operation or repair of the Dock. Local Tugs and Offshore Shipyard were the only regular repairmen for the Dock. Garde may rest with the repairman. Loescher v. Parr, supra. We find that Local Tugs and Offshore Shipyard, and no one else, had the garde of the Dock. We find no personal liability on the part of Tom Popich. The garde of the Dock did not rest with Tom Popich as an individual and he owed no duty as an individual to plaintiff.
We do not mean to suggest that anytime a party undertakes to nail down one loose board on a dock that party is automatically vested with garde of that thing. Each case stands alone on its facts and the facts of this particular case warrant our finding that Local Tugs and Offshore Shipyard had the garde of the Dock for purposes of imposing strict liability under La.C.C. art. 2317.

PLAINTIFF FAULT
The trial court found plaintiff to be at fault and assessed her fault at 33 1/3%. There being no inconsistent finding as to that factual conclusion, we will review it under the manifestly erroneous/clearly wrong standard of appellate review. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, Overseas Corp. v. Youn, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
The trial court found that plaintiff was aware of the difference in height between the walkway and the dock itself and was negligent stepping heavily on the board. Although plaintiff testified that she did not *644 drink, the court also found that there was evidence that plaintiff had possibly been drinking on the night of the accident. She and her husband had been at the Orange Festival and had stopped off at a bar on the way to the Dock. The trial court observed the demeanor and conduct of the witness, he may have seen something that we cannot see from the record and may also have felt her credibility was undermined because she failed to inform any of her treating physicians of the reported 1984 injury to her knee.
Considering all of the facts and circumstances we are not prepared to say that the trial court was clearly wrong in finding that plaintiff was at fault in causing the accident or in assessing that fault at 33 1/3% of the total.

DAMAGES
The trial court awarded plaintiff damages as follows:

Physical pain and suffering:
 Past $ 25,000.00
 Future $ 25,000.00
Past disability $ 10,000.00
Past medical expenses $ 9,947.39
Past lost wages $ 8,748.00
Scarring and disfigurement $ 15,000.00
Mental pain and suffering:
 Past $ 10,000.00
 Future $ 10,000.00
 ___________
 TOTAL $113,695.39

The jury found no liability as to any defendants and therefore made no award of damages to plaintiff. Therefore, there is no inconsistent verdict with respect to damages and we will not review the award de novo. The only issue plaintiff raises with respect to damages is that the trial court erred in failing to award damages for loss of future wages.
Before she can recover damages for future lost wages, a plaintiff must prove the loss with reasonable certainty. Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 4th Cir.1990), writ denied, 569 So.2d 965 (La.1990). See also, McGowan v. Sewerage and Water Board of New Orleans, 555 So.2d 472 (La.App. 4th Cir.1989). However, such damages need not be proven with mathematical certainty. Whatley v. Regional Transit Authority, supra. Whether or not there is sufficient proof of loss of future income is a question of fact. A trial court's factual findings as to loss of future earnings may not be disturbed absent a finding that it was without foundation and/or was clearly wrong. Youn v. Maritime Overseas Corp., supra; Arceneaux v. Domingue, supra.
Loss of future income is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury, but upon the difference between a plaintiff's earning capacity before and after an injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Perkins v. Ricks, 514 So.2d 180 (La.App. 4th Cir.1987), writ denied, 519 So.2d 117 (La.1988).
In the instant case the only evidence plaintiff presented as to her loss of future income was her own testimony as to what types of work she feels she can perform. There was no medical testimony as to her physical limitations. She presented no testimony from an expert in vocational rehabilitation as to what types of employment were available to her. She presented no testimony from an economist concerning future earnings. She presented no evidence concerning her work life expectancy.
The trial court agreed that there was no evidence of future disability, i.e., that plaintiff failed to prove her loss of future earnings with any degree of certainty. We are unable to say that such a finding was clearly wrong or manifestly erroneous.
Defendants Local Tugs and Offshore Shipyard do not specifically argue that the awards of damages were excessive. They do raise causation as to the injuries which we have already addressed.

PRESCRIPTION
A number of Popich defendants, including Offshore Shipyard and presumably Local Tugs, filed an exception of prescription on appeal claiming that prior to the accrual of prescription on December 6, 1987 plaintiff had named as defendants only the Parish and its insurer, Popich Bros. Water Transport, Inc., Popich Enterprises, Inc. and Popich Lands, Inc. and their alleged unnamed insurer(s). Offshore Shipyard and Local Tugs *645 were added as defendants after December 6, 1987 and they argue that the claims prescribed as to them.
La.C.C.P. art. 1153 provides that when an action asserted in an amended petition arises out of the conduct, transaction or occurrence set forth in the original petition, the amendment relates back to the date of the filing of the original petition. In Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983), the Louisiana Supreme Court set forth the following criteria for determining whether an amendment changing the identity of a defendant or defendants relates back to the date of the filing of the original petition pursuant to C.C.P. art. 1153:
(1) The amended claim must arise out of the same transaction or occurrence set forth in the original pleading;
(2) The purported substitute defendant must have received notice of the institution of the action such that he will not be prejudiced in maintaining a defense on the merits;
(3) The purported substitute defendant must know or should have known that but for a mistake concerning the identity of the proper party defendant, the action would have been brought against him;
(4) The purported substitute defendant must not be a wholly new or unrelated defendant, since this would be tantamount to assertion of a new cause of action which would have otherwise prescribed.
Id. at 1087.
In the instant case, the amended claim naming Local Tugs and Offshore Shipyard arose out of the same transaction and occurrence. Three Popich companies owned by Tom and Joe Popich were named in the first amended petition filed on November 30, 1987, within the prescriptive period. Local Tugs and Offshore Shipyard presumably received notice of the action filed against the three Popich companies in the first amended petition. Considering the interrelationship of the Popich companies we believe Local Tugs and Offshore Shipyard were not prejudiced in maintaining a defense on the merits. Considering the allegations set forth in the original and first amended petitions, Local Tugs and Offshore Shipyard knew or should have known that but for a mistake concerning the identities of the Popich companies whose employees performed repair work on the Dock, the action would have been brought against them. While Local Tugs and Offshore Shipyard are separate and distinct entities from the three companies named in the first amended petition, all of the Popich companies are somewhat related. Considering these facts and circumstances we find that the amendment to the original petition adding Local Tugs and Offshore Shipyard as defendants relates back to the filing of the original petition, June 23, 1987. The exception of prescription is overruled.

LIABILITY OF INSURERS
Two insurers were named as defendants: Ocean Marine Indemnity Co. ("Ocean Marine") and Institute of London Underwriters ("ILU"). The trial court did not render judgment against either of these defendants. On appeal both claim they are not liable to plaintiff.
ILU issued a comprehensive general liability/ship repairers legal liability policy to Offshore Shipyards for the 12-month period commencing September 17, 1986. ILU bases its claim of non-liability on the supposition that Offshore Shipyard did not have the garde or custody of the Dock and is not liable. We have found that Offshore Shipyard is liable. The ILU policy covers that liability of Offshore Shipyard and we will render judgment against ILU accordingly.
Ocean Marine issued a policy to Popich Brothers Water Transport, Inc., with that company as the named insured, providing excess protection and indemnity and excess collision coverages to vessels belonging to that company. This policy was introduced into evidence. Plaintiff attached to one of her briefs on appeal a copy of a policy allegedly issued by Ocean Marine to Local Tugs specifically listing Local Tugs as the named insured. However, this policy admittedly was not introduced into evidence. In their brief Ocean Marine only addresses the policy issued to Popich Brothers Water Transport and correctly argues that policy provides no *646 coverage for Local Tugs.[6] We have held that Popich Brothers Water Transport is not liable to plaintiff. Therefore, Ocean Marine is not liable to plaintiff through the policy it issued to Popich Brothers Water Transport. Any liability must be through the policy specifically issued to Local Tugs.
No judgment can be rendered against Ocean Marine pursuant to a policy which was not introduced into evidence. See Patterson v. Meyers, 583 So.2d 79 (La.App. 4th Cir.1991). The introduction into evidence of the insurance policy allegedly providing coverage for the tortfeasor is an essential element of a plaintiff's burden of proof in a suit against an insurer. See Kabir v. City of Lafayette, 509 So.2d 464 (La.App. 3rd Cir.1987). The policy itself was not introduced into evidence and therefore we cannot render a judgment against Ocean Marine as the insurer of Local Tugs.

FRIVOLOUS APPEAL
Ocean Marine seeks damages for frivolous appeal claiming that plaintiff appealed the failure of the trial court to render judgment against it when the evidence only showed that it insured Popich Brothers Water Transport vessels; that there was no evidence indicating that vessels belonging to Popich Brothers Water Transport had any connection with the Dock; that the trial court rendered judgment in favor of Popich Brothers Water Transport; and plaintiff did not appeal that judgment in favor of Popich Brothers Water Transport. Popich Brothers Water Transport, Inc., Local Tugs, Inc., Diamond Barges, Inc., Service Tugs and CrewBoats, Inc. and Venice Jo-Boats, Inc. also seek damages for frivolous appeal.
Appeals are favored and appellate courts should impose damages for frivolous appeal only when it appears that the appeal was taken solely for delay or appellant's position is without legal foundation. Zatzkis v. Zatzkis, 632 So.2d 307 (La.App. 4 Cir.1993); Michael v. Michael, 602 So.2d 1099 (La.App. 1 Cir.1992). Where contentions on appeal are without merit but raise legitimate issues, damages for frivolous appeals are not warranted. Zatzkis v. Zatzkis, supra; Sample v. Sample, 432 So.2d 376 (La.App. 1 Cir.1983).
Plaintiff's brief on appeal was directed to getting this court to consider the Ocean Marine policy issued to Local Tugs which may or may not have provided coverage for this accident. Under these circumstances we decline to award damages for frivolous appeal.
As to the Popich companies, because of the nature of the interrelationship of these companies we feel an award of damages for frivolous appeal is not warranted.

JUDGMENT
For the reasons assigned we affirm those portions of the trial court judgment:
1. Granting directed verdicts against plaintiff Stacy Buffinet and in favor of defendants Popich Brothers Water Transport, Inc., Venice Jo-Boats, Inc., Service Tugs and Crew Boats, Inc., Popich Superior Oyster Company and Oyster Lands Leasing, Inc., dismissing with prejudice all claims of plaintiff with respect to premises liability;
2. Granting directed verdicts against plaintiff Stacy Buffinet and in favor of defendants Popich Brothers Water Transport, Inc, Local Tugs, Inc. Diamond Barges, Inc., Service Tugs and Crew Boats, Inc., and Venice Jo-Boats, Inc., dismissing with prejudice all claims of plaintiff with respect to vessel striking;
3. Granting directed verdicts against plaintiff Stacy Buffinet and in favor of defendants Popich Brothers Water Transport, Inc., Local Tugs, Inc., Diamond Barges, Inc., Service Tugs and Crew Boats, Inc. and Venice Jo-Boats, dismissing with prejudice all claims of plaintiff with respect to vessel negligence and/or striking;

*647 4. Assessing plaintiff's total damages at $113,695.39;
5. Finding plaintiff at fault and assessing her fault at 33 1/3%;
6. Fixing and awarding expert witness fees as following:

Sheldon Held $ 500.00
Dr. Hiromu Shoji $ 250.00
Dr. Stuart Philips $ 300.00
Dr. David Beary $ 500.00
Dr. Charles Anastasio $1,000.00

We reverse all other portions of the trial court judgment and render judgment against plaintiff Stacy Buffinet and in favor of defendants Plaquemines Parish Commission Council (and/or its predecessor and/or successor), Tom Popich, individually, Popich Lands, Inc., Popich Enterprises, Inc., Diamond Barges, Inc. as to all claims against them by plaintiff.
We further render judgment in favor of plaintiff Stacy Buffinet and against defendants Local Tugs, Inc., Offshore Shipyards, Inc. and Institute of London Underwriters, jointly and in solido, in the amount of SEVENTY FIVE THOUSAND SEVEN HUNDRED NINETY SIX AND 93/100 ($75,796.93) DOLLARS, plus legal interest from the date of demand. All costs are assessed against defendants Local Tugs, Inc. and Offshore Shipyards, Inc.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] La.R.S. 13:5105 provides:

No suit against the state or a state agency or political subdivision shall be tried by jury.
[2] In inconsistent findings cases in at least three other circuits appellate courts determine which finding is the "more reasonable." See Haydel v. Commercial Union Ins. Co., 617 So.2d 137 (La. App. 5th Cir.1993), writ denied, 619 So.2d 551 (La.1993); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3d Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988); Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.1977), writs denied, 897, 898, 900 (La.1977).
[3] At the time of the accident there was no Local Tugs policy prohibiting non-employees from walking on the Dock.
[4] Liability of Service Tugs & Crew Boats will not be considered as plaintiff raised no assignment of error as to that company. See infra.
[5] Larry Landry testified that subsequent to plaintiff's accident he did repairs to the Dock while employed by Diamond Barges. However, that along with docking the water barge at the Dock is not sufficient to establish garde.
[6] Local Tugs, Inc. was listed as an "additional insured" under the Ocean marine policy issued to Popich Brothers Water Transport but only during such times as the named insured vessel(s), all belonging to Popich Brothers Water Transport and specifically listed in the policy, was (were) "actually working for" Local Tugs. There is no evidence whatsoever that vessels belonging to Popich Brothers Water Transport ever actually worked for Local Tugs.