hMURRAY, J.,
concurring in part and dissenting in part with reasons.
While I agree with the majority’s determination that the evidence supports an award for loss of earning capacity, I must respectfully dissent regarding the amount of that award. In addition, I concur in affirming the award for future medical expenses.
An award for loss of earning capacity requires only the presentation of “medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident” at issue. Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991). This medical evidence may be corroborated and complemented by lay testimony, including that of the *723 plaintiff. Bize v. Boyer, 408 So.2d 1309, 1312 (La.1982); McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993). Moreover, because public policy favors bringing a case to trial as quickly and efficiently as possible, “[t]he fact that an injured party has not reached maximum recovery and has not been assigned a disability rating does not defeat his claim for loss of future wages.” Whigham v. Boyd, 97-0693, p. 10 (La.App. 4th Cir.10/1/97), 700 So.2d 1163, 1168. The trial court’s determination that a loss of future earnings has been proven is a factual finding that cannot be disturbed on appellate review unless it was without foundation and/or 12was clearly wrong. Buffinet v. Plaquemines Parish Comm’n Council, 93-0840, pp. 20-21 (La.App. 4th Cir.7/27/94), 645 So.2d 631, 644 (citations omitted).
In this appeal, the defendant asserts that there was no evidence that Mr. Parker would have any permanent impairment of his earning capacity, but only a temporary restriction to light-duty work. However, the evidence outlined below establishes, to a reasonable certainty, that Mr. Parker has suffered a permanent disability as a result of the injuries to his back and neck.
Initially, Mr. Parker’s back and neck injuries were treated conservatively from March 21, 1997 to July 27, 1998 by Dr. Kenneth N. Adatto, an orthopedic surgeon, and by a chiropractor, Dr. Barrett S. Richter, from April 2, 1998 to September 9, 1998. However, because this treatment brought little improvement, Mr. Parker consulted Dr. Kenneth E. Vogel, a neurosurgeon, on September 22, 1998. Based upon the physical exams, diagnostic tests, and review of records of Mr. Parker’s pri- or care, Dr. Vogel performed a four-level bilateral lumbar neurotomy on December 2, 1998. This procedure resulted in a significant reduction in Mr. Parker’s back pain, but his neck condition continued to worsen. On July 1, 1999, Dr. Vogel did a medial branch neurotomy at five levels on the right side of Mr. Parker’s neck, to be followed by rehabilitation therapy for one year.
When Dr. Vogel was first deposed on May 7, 1999, he testified that after a neu-rotomy, “85 percent of the patients when they reach MMI do not have a disability. We’re able to lift the disability at one year.” Because Mr. Parker had had such good results from the lumbar neurotomy, Dr. Vogel expected a similar recovery after the cervical procedure, which had not yet been scheduled. Dr. Vogel was then questioned about the potential effect of the cervical neurotomy, | ^combined with the prior back surgery, on Mr. Parker’s work capacity:
Q: .... How is [the cervical neuroto-my] going to affect his disability, if at all?
A: In isolation, the statistics are the same, however, if at the end of a year he says, Oh, my neck and back are feeling pretty good, I would probably tell him, Look, you don’t have a disability, and I want you to go back to work, but I would advise when you go back to work you avoid the heavy lifting, pushing, and pulling.
Q: So even if he has the neurotomy on the neck, you’d still probably tell him there is a fifty-pound restriction in effect?
A: Right. But I might — instead of saying I’m going to lift this at one year, since he’s had both of them, I might say, Look, it might be prudent that when you went back to work, that you avoid lifting, pushing or pulling greater than 50 pounds on a permanent basis simply because you had both your neck and low back injured.
*724 Dr. Vogel then explained that his usual procedure was to do a functional capacity evaluation after the one-year recovery period for a definitive measurement of what the individual could tolerate. When questioned further about a permanent versus a temporary 50-pound restriction, Dr. Vogel stated that he believed the permanent restriction “would be prudent” in this case.
Dr. Vogel was re-deposed on August 20, 1999, after the cervical neurotomy had been performed and just three days before trial. Dr. Vogel again stated that he expected Mr. Parker to reach maximum medical improvement within one year of the most recent procedure, by July 1, 2000. Regarding the extent of disability, the doctor explained:
A: He’ll have a temporary 10 to 15 percent permanent [sic] partial total body medical impairment. He’ll be asked to avoid those activities requiring him to lift, push or pull greater than 50 pounds or repeatedly hyperextend or flex his neck for at least one year. At one year he will be re-evaluated to determine if there’s any permanent disability.
Q: So the disability that you just stated lasts for a year and then you re-evaluate in a year to determine whether or not that is going to |4be a permanent disability?
A: Yes.
On cross-examination, Dr. Vogel conceded that “at this point” he could not say “one way or the other” whether the 50-pound restriction would be temporary or permanent, or even that Mr. Parker would not be able to do some light or sedentary work before the one-year recovery period had lapsed. However, while he again emphasized that a functional capacity evaluation would be necessary before Mr. Parker could be released to return to work, Dr. Vogel did not contradict his earlier deposition testimony that, in his opinion, a permanent restriction on lifting, pushing and pulling “would be prudent.” Thus, the testimony of plaintiffs treating physician supports the trial court’s conclusion that, although maximum recovery would not be reached until several months after trial, there was a reasonable certainty of a residual disability resulting from this accident.
Additional support for this determination, noted in the trial court’s written reasons, is found in the report of Dr. Robert L. Applebaum, the defendant’s expert in neurological surgery. Dr. Applebaum examined Mr. Parker on April 13, 1999, after the lumbar neurotomy but before the cervical neurotomy had been performed. In his report prepared the day after this examination, Dr. Applebaum wrote in part:
Examination at the current time shows no significant mechanical and equivocal neurological findings.... I feel he could return to some form of moderate work with no prolonged bending or stooping or lifting any loads greater than 40 to -50 pounds. This could perhaps be best documented by a functional capacity evaluation.
[Emphasis added.] The trial court acknowledged that when Dr. Applebaum was later deposed on August 18, 1999, he retracted his opinion regarding any restrictions, testifying that he believed he “was mistaken” when he dictated that recommendation because he now saw no basis for it. On cross, however, Dr. | ¡Applebaum admitted that he had no “specific recollection of Darrel Parker” and was testifying based solely upon his notes and records. Accordingly, despite the later disclaimer, Dr. Applebaum’s report provides further factual support for the trial court’s decision that Mr. Parker’s injury resulted in some loss of earning capacity.
*725 While I thus agree that it was not manifestly erroneous to compensate Mr. Parker for a loss of earning capacity, I must dissent from the majority’s decision to affirm the amount awarded for this element of damages. Although an award for loss of earning capacity “is inherently speculative and is not susceptible of calculation to a mathematical certainty,” the record must contain evidence that reasonably supports the assigned value of the loss. Reichert v. Bertucci, 96-1213, pp. 8-9 (La.App. 4th Cir.12/4/96), 684 So.2d 1041, 1046.
In this case, the trial court awarded Mr. Parker $295,154.06 for future lost earnings, stating in the written reasons that the amount was based upon an economist’s loss estimate “net of minimum wage.” However, the determination that the plaintiff would be limited to minimum wage positions is contrary to the deposition testimony of Nancy T. Favaloro, offered by the plaintiff as an expert vocational rehabilitation counselor. Based upon her interview with Mr. Parker and her review of his medical records, Ms. Favaloro opined that once he could return to work he would be limited to semi-skilled, light-to-medium employment. In the commuting area of Port Sulphur, Louisiana, where Mr. Parker lives, she found jobs within that classification paid an entry-level wage between six and seven dollars per hour, or approximately $15,000 per year. Given this un-contradicted testimony, it was manifestly erroneous for the trial court to award Mr. Parker an amount based upon future earnings at minimum wage rates, rather than at $6 or $7 per hour.
| ^Finally, I concur with the majority in affirming the trial court’s award for future medical expenses. When a need for future medical care is established by the evidence but the cost is uncertain, a reasonable award may be made. Stiles v. K Mart Corporation, 597 So.2d 1012, 1018 (La.1992). In this case, Dr. Vogel testified unequivocally that although Mr. Parker was not expected to undergo any additional surgery, he would require some form of medication and/or therapy to manage pain and discomfort for the rest of his life. Because the plaintiff was only 28 years old at the time of trial, I cannot say that an award of $10,000.00 for future care was an abuse of the trial court’s discretion.